**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
MANUEL HORNEDO,

                           **Petitioner,**

         -against-

DALE ARTUS, Warden,
Clinton Correctional Facility,

                         **Defendant.**
---------------------------------------------------------------x

                      **REPORT AND**
                      **RECOMMENDATION**

                      **04-CV-3201 (NGG)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      In this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, *pro se*

petitioner Manuel Hornedo ("petitioner" or "Hornedo") challenges his conviction in New

York State Supreme Court, Kings County, for Manslaughter in the First Degree, Assault in the

Second Degree, and two counts of Criminal Possession of a Weapon in the Fourth Degree.

Petitioner contends that the state court violated his Fourth Amendment rights by failing to

suppress custodial statements and identification evidence as fruits of an illegal arrest. He

further argues that he was deprived of his right to due process and a fair trial by the state

court's refusal to suppress unreliable identification evidence and by the prosecutor's improper

remarks during his opening statement and summation. In April 2006, the petition was referred

to the undersigned magistrate judge by the Honorable Nicholas G. Garaufis for a Report and

Recommendation. For the reasons that follow, this Court recommends that the petition be

denied and the case be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Evidence at Trial

Hornedo's conviction arises from the assault of Danny Abraham ("Abraham") and the homicide of Elliot Lopez ("Lopez") on September 28, 1999, in Brooklyn. Six eyewitnesses testified to the following events. All six identified petitioner in the courtroom and testified that they had picked him out of a lineup. (Trial Transcript ["T."] 181, 201, 242, 260, 293, 311, 339, 362, 383, 400, 415, 425.)

At approximately 12:30 a.m. on the morning of September 28, 1999, Abraham was sitting on a stoop in front of his apartment building at 1710 77th Street with his brother Carlos DeJesus, Carlos' girlfriend, Angela Gargiulo ("Gargiulo"), and her sister, Danielle, when petitioner drove up in a red Ford Probe and parked in front of the building. (T. 204-06, 288-91, 337-39, 413.) Petitioner and a passenger emerged, leaving behind a woman whom Gargiulo recognized as Daniela Farace (petitioner's girlfriend).[1] (T. 180, 214, 338-40.)

Petitioner got into a fist fight with a young man who was sitting with a group of youths in front of the adjoining building, at 1704 77th Street. (T. 181-82, 218, 292-93, 314-16.) Petitioner then retrieved a wrench from the driver's seat of his car, walked back over to the male and raised his arm to swing the wrench at him. (T. 182-83, 294-95, 341-42.) The passenger from petitioner's car grabbed petitioner to prevent him from doing so. (T. 183, 295, 342.) Petitioner walked back to his car and smacked the hood with his fists, exclaiming

---

[1] Angela Gargiulo testified that she and Farace used to live together. (T. 369.) Farace's name also appears in the record as "Danielle Farache."

2

that he was "King Pee Wee" and wanted respect, and that when he returned he was going to "cap" somebody. (T. 183-84, 296-97, 343.) He then got into his car and drove away. (T. 184, 297, 344.)

About 23 hours later, at approximately 11:30 p.m., Abraham was again hanging out with DeJesus and Gargiulo, and with Abraham's aunt, Edda Abraham ("Edda"), on the front stoop of 1704 77th Street. (T. 185, 298, 344.) Petitioner drove up in the red Ford Probe, accompanied by a black car with tinted windows, and several people emerged from the vehicles. (T. 186-87, 300-03, 345-50, 371-73, 381.)[2] Petitioner, wielding a Club – an automobile anti-theft device – approached Abraham and said "What the fuck I told you," and demanded to know whether Abraham and the others had been with the group that petitioner had confronted the night before. (T. 191-92, 348-49, 383-84.) When Edda responded that they had not, Hornedo hit Abraham on the left side of his head with the Club. (T. 192, 249, 303, 348-49, 384-86, 419.) Edda stepped between the two men, whereupon Abraham ran into a store on the corner of 77th Street and 17th Avenue. (T. 193-94, 349-51, 387.) He told store employees that someone was trying to kill him, and they closed the front gate. (T. 195.)[3]

As petitioner and his friends went after Abraham, they passed Lopez, who was talking on an outdoor pay phone next to the store. Petitioner hit Lopez on the head with the Club. (T. 249-52, 308, 351-54, 388-92, 422.) Lopez's dog lunged at petitioner, who hit the dog with the

---

[2] The testimony of the witnesses differed somewhat as to how many people left each car.

[3] In addition to Abraham and his friends and family, two other individuals witnessed the confrontations on 77th Street: Nolan Tropia, who was walking his dog at the time of both incidents (see T. 237-59); and Joseph Gagliardo, who saw the events from the window of his apartment at 1704 77th Street. (See T. 413-25.)

Club, causing the dog to run off. (T. 252-53, 308-09, 354, 392, 422-23.) Lopez then began running toward his home, and petitioner told his friends to "[g]o get him." (T. 309-10, 328-31, 355-57, 393-94.) Upon reaching his front door, Lopez tried unsuccessfully to open it as the group closed in on him. (T. 357-60, 254.) He resumed running, turning the corner at 76th Street, and heading toward Utrecht Avenue. (T. 257, 358-59.) Petitioner got back in his car and drove toward 76th Street, while others followed on foot. (T. 255-56, 355-56, 394-96.) Several of the men may have been holding "shiny objects" (T. 377), although no one saw petitioner with a knife. (T. 224, 281, 323-27, 409.) After the group turned the corner onto 76th Street, Edward Brontz, who heard cursing and screaming in the street, looked through his apartment window and saw several young men -- including one who pulled up in and emerged from a red sports car -- beating Lopez. (T. 485-89.) No witnesses specifically saw anyone stab Lopez. (T. 281, 330.)

At 11:55 p.m. that evening, Christie Cataldo, an emergency medical technician, arrived at the scene to find Lopez lying on the sidewalk in a pool of blood, still alive but unable to breathe. (T. 49-50, 62-63.) She observed that Lopez had twelve to sixteen stab wounds on his torso and a laceration on the back of his head. (T. 53, 56, 61-64.) Lopez stopped breathing en route to the hospital by ambulance (T. 56-57), and subsequently died from the wounds. An autopsy revealed blunt trauma injury to the head, and twelve stab wounds and thirteen incised wounds to the body that were caused by a different instrument than the head injury. (T. 624-26, 646.) The medical examiner, unable to determine which injuries were inflicted first, opined that either the stab wounds or the head trauma could have caused Lopez's death. (T.

635, 641, 645-46, 648-49.)

The next day, members of the New York City Police Department ("NYPD") arrested petitioner at his mother's apartment. (T. 592, 597.) The red Ford Probe was parked in front of the building. After obtaining permission to search the vehicle from its registered owner, Daniela Farace, detectives recovered two Clubs and a hammer. (T. 600-02.)

Petitioner was brought to the police precinct where he was given *Miranda* warnings. (T. 461-64.) During the ensuing interrogation, petitioner told detectives that he and his girlfriend had gone out in the early morning hours of September 28, 1999, to look for the men who had allegedly robbed her and her baby at gunpoint. (T. 464.) While they were out, he was "jumped" by some men, who beat him up and broke his windshield. He later went to "the vicinity of 77th Street," where he got into a fist fight. (T. 465.) He insisted, however, that later that night, when Lopez was killed, he was at his mother's house. (T. 465.)

The defense did not present any witnesses at trial, relying solely on cross-examination.

## II. Conviction and Sentence

The jury convicted petitioner of Manslaughter in the First Degree, Assault in the Second Degree, and two counts of Criminal Possession of a Weapon in the Fourth Degree. (T. 763-65.) On November 1, 2000, petitioner was sentenced, as a persistent violent felony offender, to concurrent terms of imprisonment of twenty-five years to life on the Manslaughter charge, twelve years to life on the Assault charge, and one year on each of the Criminal Possession charges. (Transcript of Sentence at 3, 18-19.)

## III. Pretrial Hearings

### A. *Wade* Hearing

Prior to trial, on September 11, 2000, the state court conducted a hearing pursuant to United States v. Wade, 388 U.S. 218 (1967), to determine the admissibility of identification evidence that petitioner claimed was tainted by an unduly suggestive lineup. Testimony was also elicited regarding a photo array, although defense counsel represented to the court that he did not, in fact, intend to challenge it. (*Wade* Hearing ["WH."] 56.)[4]

NYPD Detective Paul Rossi testified that after the assault, he and Detective Miguel Hernandez interviewed eyewitnesses, who said that the perpetrator referred to himself as "King Pee Wee" and drove a red Ford. (WH. 17-21.) Rossi, assuming that the street name indicated an affiliation with the Latin Kings gang, contacted the NYPD's Gang Intelligence Unit, which provided petitioner's proper name and a photo, in which petitioner appeared to be a light-skinned black male. (WH. 22-23.) Rossi and Hernandez assembled a photo array and showed it on the afternoon of September 29th to five witnesses: Gargiulo, Abraham, Edda, Tropia, and Gagliardo. Edda, Gargiulo and Gagliardo identified petitioner, while Abraham and Tropia were unable to make an identification. (WH. 23-28.)

Rossi arrested petitioner that afternoon. At 11:00 p.m., Rossi and Hernandez conducted a lineup consisting of petitioner and five fillers, all of whom were police officers. (WH. 41-42.) Care was taken to prevent witnesses from seeing any of the fillers prior to the

---

[4] The judge inquired, "Counselor, are you challenging the photo array?" Defense counsel responded, "No sir." (WH. 56.) Although defense counsel referred repeatedly to the photo array during his oral argument, he later clarified that he "mean[t] the line-up at all times." (WH. 71-73.)

lineup, and to sequester them from each other in different rooms of the precinct. (WH. 42, 44-50.) Because petitioner was taller than the fillers, all men in the lineup were seated. (W. 52.) Petitioner chose the first seat, and was given an opportunity between the third and fourth viewings of the lineup to change his position, but declined to do so. (WH. 43, 51; T. 607.) Six witnesses separately viewed the lineup: Abraham, Tropia, DeJesus, Gargiulo, Edda, and Gagliardo. (WH. 41, 44-50; see T. 608-09.) Each witness identified petitioner without hesitation. (WH. 44-50.)

At the conclusion of Rossi's testimony at the hearing, defense counsel argued that the lineup was improper because one of the fillers had been holding a lit cigar, which he claimed could have discouraged witnesses from selecting him as the suspect, and because the fillers generally did not resemble petitioner. (WH. 71-73.) After considering the arguments, the court rejected the *Wade* challenge and subsequently issued a written decision concluding that neither the photo array nor the lineup was unduly suggestive and denying petitioner's *Wade* motion to suppress. (WH. 71, 73; Opinion & Order, September 25, 2000 ["9/25/00 Op."] at 6.)

### B. *Payton* Hearing

On September 13, 2000, the court held a hearing pursuant to Payton v. New York, 445 U.S. 573 (1980),[5] to determine whether the police had violated petitioner's Fourth Amendment rights when they arrested him at his mother's apartment without a warrant. Detective Rossi's

_____

[5] In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court held that the Fourth Amendment prohibits the police from entering a suspect's home, without consent or an arrest warrant, to make a routine felony arrest in the absence of exigent circumstances.

testimony, which the hearing court fully credited, established that on September 29, 1999, with the intention of arresting petitioner, Rossi went with Detective Hernandez and a team of officers to petitioner's mother's residence, a third-floor apartment inside a three-level semi-attached house at 2835 West 19th Street in Coney Island. (*Payton* Hearing ["PH."] 35; WH. 58; T. 594.) They did not have an arrest warrant. (WH. 58.)[6] The detectives and officers surrounded the building with guns drawn. (PH. 24, 39.) To lure petitioner out, Hernandez telephoned him and said, in Spanish, "5-0 is coming. Get out of there," referring to the fact that the police were on their way. (WH. 33-34; see T. 456.) Petitioner leaned his upper body out of a window at the rear of the house, looked around, and then started "moving erratically," as if "he might have been trying to escape." (PH. 20-21; see 9/25/00 Op. at 3 [finding that petitioner was "apparently looking for a means of escape."].) Rossi ordered him to come out of the house. (PH. 32.) After petitioner went back inside, he shouted to Rossi that there was a child in the apartment, and that he would comply. (PH. 22, 32.) Rossi then went around to the front of the building, walked through the unlocked door, and proceeded up the stairs. (PH. 25.) Petitioner opened the door to the apartment and took "two or three [steps]" into the hallway, where he was arrested. (PH. 25.)

Petitioner, the only defense witness at the hearing, testified that twice a week during the period preceding his arrest, he would sleep at his mother's house, where he had his own room with a bed, VCR, television and stereo; and that he possessed a set of keys, received mail

---

[6] According to the transcript of the *Wade* hearing, Detective Rossi testified that he had a search warrant. (WH. 58.) However, the hearing court's written opinion does not mention any search warrant. (See generally 9/25/00 Op.) For purposes of this analysis, the Court assumes there was no search warrant or arrest warrant.

there, and was often home without his mother. (PH. 3-4.)

The court found that petitioner's testimony was "largely incredible," and held that he did not have standing to challenge the entry into his mother's house to effect his arrest.[7] (9/25/00 Op. at 2, 4, 6-7.) Accordingly, his *Payton* motion was denied. The court expressly declined to "decide the question of whether a *Payton* violation took place in this case." (9/25/00 Op. at 7.)

## IV. Post-Conviction History

Petitioner appealed from his judgment of conviction to the Appellate Division, Second Department. Appellate counsel filed a brief raising the following claims: (1) the lower court violated petitioner's Fourth Amendment rights by failing to suppress the lineup identification and petitioner's post-arrest statements as fruits of a *Payton* violation; (2) the court deprived petitioner of his due process right to a fair trial by refusing to suppress proof of a suggestive lineup, as well as in-court identifications allegedly tainted by both the lineup and a suggestive photo array; and (3) the prosecutor's remarks in his opening statement and summation deprived petitioner of his due process right to a fair trial. (Brief for Defendant-Appellant ["Def. App. Br."] at 43, 54, 60.)

By unanimous decision dated March 17, 2003, the Appellate Division affirmed petitioner's conviction. People v. Hornedo, 759 N.Y.S.2d 84 (2d Dep't 2003). In its decision, the Appellate Division held that "defendant failed to demonstrate that he had a

_____

[7] The court concluded that inconsistencies in petitioner's testimony regarding how often he stayed at his mother's house demonstrated his "willingness to tailor his testimony to the needs of the moment . . . ." (9/25/00 Op. at 6.)

legitimate expectation of privacy in his mother's apartment." Id. at 602. Specifically, the appeals court observed that "[t]he evidence adduced at the hearing," including petitioner's acknowledgment that he stayed with his girlfriend for long periods of time and kept his clothes there, and that his name and personal information appeared on the lease to his girlfriend's apartment, "indicated that [petitioner] was living with his girlfriend at another location at the time of his arrest." Id. The Appellate Division also affirmed the hearing court's determination that the lineup was not suggestive, and held that because defense counsel had stated at the hearing that he did not intend to challenge the photo array, review of that issue was waived. Id. at 602-03. Finally, the appellate court held that petitioner "was not unduly prejudiced by the prosecutor's questionable remarks, given the trial court's prompt curative instructions." Id. at 603.

On April 14, 2003, petitioner filed a letter application for leave to appeal to the New York Court of Appeals, raising the question of whether the United States Supreme Court's decision in Minnesota v. Carter, 525 U.S. 83 (1998), "require[s] the New York courts to recognize an expectation of privacy on the part of 'social guests,' including immediate family members, who would otherwise lack standing to challenge an unreasonable search or seizure under the narrower 'overnight guest' standard" enunciated in Minnesota v. Olson, 495 U.S. 91 (1990). (See Exhibit C ["RX C"] to Respondent's Affidavit in Opposition to Petition for Writ of Habeas Corpus, at 1.) In a one-paragraph section entitled "Additional Issues," petitioner added that "[l]eave to appeal should also be granted to review the prosecutorial misconduct discussed in point III of Appellant's Brief in the Appellate Division." (RX C at 6-7.) By certificate dated August 6, 2003, petitioner's application for leave to appeal was denied. See

People v. Hornedo, 766 N.Y.S.2d 170 (2003).

Petitioner timely filed the instant habeas corpus petition on July 26, 2004, raising

the same claims as those he presented to the Appellate Division.

## DISCUSSION

### I.  Fourth Amendment Claim

Petitioner's claim that his warrantless arrest at his mother's apartment constituted a

*Payton* violation is not cognizable on habeas review.  Pursuant to the Supreme Court's decision

in Stone v. Powell, 428 U.S. 465 (1976), "where the State has provided an opportunity for full

and fair litigation of the Fourth Amendment claim, the Constitution does not require that a

state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in

an unconstitutional search or seizure was introduced at his trial."  Id. at 482.  The Second

Circuit, interpreting Powell, has concluded that a Fourth Amendment claim is reviewable on

habeas in only one of the following instances: "(a) if the state has provided no corrective

procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has

provided a corrective mechanism, but the defendant was precluded from using that mechanism

because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975

F.2d 67, 70 (2d Cir. 1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977) (en

banc)).

Petitioner concedes, as he must, that New York's Criminal Procedure Law, which

permits a criminal defendant to file a pretrial motion to suppress any evidence unlawfully

seized, provided a corrective procedure to redress any Fourth Amendment violation.  See

Capellan, 975 F.2d at 70 n.1 ("Indeed, the federal courts have approved New York's procedure

11

for litigating Fourth Amendment claims, embodied in N.Y.Crim.Proc.Law § 710.10 *et seq.*[], as being facially adequate.") (internal quotation marks and citation omitted). Petitioner nevertheless contends that an unconscionable breakdown in that procedure deprived him of the opportunity to fully and fairly litigate his *Payton* challenge. (Petitioner's Memorandum of Law ["Pet. Reply"] at 2-3.)[8] Petitioner's argument is meritless. The trial court conducted a *Payton* hearing and, after extensive testimony, rejected petitioner's claim; concluding that petitioner failed to establish that he had a reasonable expectation of privacy in his mother's apartment, the court held that he lacked standing to challenge the entry into the apartment to effect his arrest. The Appellate Division explicitly affirmed this determination, and the Court of Appeals denied leave to appeal.

While petitioner may disagree with this decision, "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72; see Stephanski v. Superintendent, 433 F.Supp.2d 273, 283 (W.D.N.Y. 2006) ("The fact that the outcome was not to [petitioner's] liking does not mean that there was an 'unconscionable breakdown' in the process in this case."); Lucas v. Miller, No. 02 Civ. 9303 (DAB)(FM), 2005 WL 2291194, at *5 (S.D.N.Y. Aug. 17, 2005) (petitioner's claim that he was arrested without probable cause or exigent circumstances is unreviewable where he had the opportunity to present his claim at "an extensive pretrial hearing."); Cappiello v. Hoke, 698 F.Supp. 1042, 1050 (E.D.N.Y. 1988) ("In short[,] an unconscionable breakdown in the state's process must be one that calls into

---

[8] Petitioner's Memorandum of Law was docketed as ECF document #15.

12

serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society."), <u>aff'd</u>, 852 F.2d 59, 60 (2d Cir. 1988) (per curiam). Indeed, "[e]ven if [petitioner] were correct in his allegation that the Appellate Division erroneously decided [the] issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result." <u>Capellan</u>, 975 F.2d at 71. Principles of comity preclude a federal habeas court from "second guessing" the outcome of a state court's application of its own corrective procedure. <u>Id.</u> at 72.

In this case the state courts made available a corrective procedure to redress any Fourth Amendment violation, and petitioner has identified no unconscionable breakdown in that process. Accordingly, the habeas court is barred from reaching the merits of petitioner's *Payton* claim.

In any event, even assuming *arguendo* that <u>Stone v. Powell</u> did not preclude review of petitioner's Fourth Amendment claim, and that petitioner had standing to complain of an alleged entry into his mother's residence, federal law -- in contrast to New York law -- does not require suppression of the proof obtained by the police at the precinct: i.e., petitioner's post-arrest statement and the lineup identifications. <u>Compare</u> <u>New York v. Harris</u>, 495 U.S. 14 (1990) (where police arrest a suspect in his home without a warrant but with probable cause, the entry into the home violates the Fourth Amendment but does not render the arrest illegal; therefore, under federal law, evidence procured from the suspect after the police leave the residence is not a product of the *Payton* violation, and is therefore not subject to suppression), <u>with</u> <u>People v. Harris</u>, 77 N.Y.2d 434, 439-40 (1991) (in contrast to federal law, under New York's constitutional right to counsel clause, incriminating statements elicited

during a custodial interrogation conducted without counsel following a *Payton* violation must be suppressed unless the taint from the violation has been attenuated). Thus, apart from the procedural bar of <u>Stone v. Powell</u>, petitioner's *Payton* challenge to the admissibility of his post-arrest statement and the lineup evidence is not cognizable on habeas review. <u>See</u> <u>Carrion v. Phillips</u>, No. 05 Civ. 189(PAC), 2005 WL 3068175, at *6 (S.D.N.Y. Nov. 15, 2005) ("It is a well-settled principle that 'federal habeas corpus relief does not lie for errors of state law.'") (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991)).

## II. Due Process Challenge to Identification Evidence

### A. Exhaustion

Petitioner additionally claims that he was denied his due process right to a fair trial by the admission of in-court identification testimony that was the product of an impermissibly suggestive lineup and photo array, as well as by the admission of proof concerning the lineup procedure.[9] (<u>See</u> Petition for Writ of Habeas Corpus ["Pet."] at 6.) Respondent rightly argues that petitioner failed to exhaust this due process claim in state court. (Respondent's Memorandum of Law dated October 19, 2003 ["Resp. Mem."],[10] at 7.) A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(b)(1). A habeas petitioner will not be deemed to have satisfied this requirement unless he has presented his federal constitutional claim to the highest court in the state. <u>See</u> <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 848-49 (1999); <u>Aparicio v. Artuz</u>, 269

---

[9] No evidence of the photo array was introduced at trial.

[10] Respondent's Memorandum of Law was filed with its Affidavit in Opposition to Petition for a Writ of Habeas Corpus, which was docketed as ECF document #11.

F.3d 78, 89-90 (2d Cir. 2001); see also Strogov v. Attorney Gen. of N.Y., 191 F.3d 188, 191

(2d Cir. 1999) ("A federal constitutional claim has not been fairly presented to the State courts

unless the petitioner has informed those courts of all of the essential factual allegations and

essentially the same legal doctrine he asserts in his federal petition.") (internal quotation marks

and citation omitted).  Here, petitioner did not present his due process eyewitness identification

challenge to New York Court's highest court, instead raising only his Fourth Amendment and

prosecutorial misconduct claims.[11]  He has therefore failed to satisfy the exhaustion

requirement.

    Nevertheless, where the petitioner "no longer has 'remedies available' in the state

courts under 28 U.S.C. § 2254(b)," the habeas court will deem the claim to be exhausted,

rather than requiring the petitioner to go through the futile process of seeking further state

review.  Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994).  In this case, petitioner can no

longer obtain review of his claim by the New York Court of Appeals, as the time for seeking

reconsideration of the denial of his leave application has expired, and New York limits

criminal defendants to only one application.  See N.Y. Comp. Codes R. & Regs., tit. 22, §

---

[11]  Petitioner raised his due process challenge to the identification evidence on direct appeal to
the Second Department, and he attached his appellate brief to his application for leave to appeal
to the New York Court of Appeals.  Nevertheless, he did not thereby fulfill the exhaustion
requirement.  See Jordan v. Lefevre, 206 F.3d 196, 199 (2d Cir. 2000) (petitioner must
"explicitly alert[] the state court to each claim raised . . . .") (citing Grey v. Hoke, 933 F.2d 117,
120 (2d Cir. 1991)); Mendez v. Artuz, No. 98 Civ. 2652(LMM), 2000 WL 722613, at *24
(S.D.N.Y.  June 6, 2000) (reference to petitioner's First Department briefs was "not sufficient to
have exhausted the claims in the New York Court of Appeals.").

500.20(d); <u>People v. Nesbitt</u>, 621 N.Y.S.2d 867 (1st Dep't 1995) ("Denial of the application for permission to appeal . . . is final and no new application may thereafter be made to any other judge or justice."). Petitioner is also procedurally barred from seeking collateral review of the claim in state court, as the issue could have been raised on direct appeal. <u>See</u> N.Y. Crim. Pro. Law § 440.10(2)(c). Therefore, petitioner's due process eyewitness identification claim should be deemed exhausted for purposes of federal habeas review. <u>See</u> <u>Perez v. Greiner</u>, 296 F.3d 123, 124 n.2 (2d Cir. 2002) (when petitioner brought his federal claim, he "no longer had the option of proceeding in state court, since only one petition is allowed under New York rules, and the time to file a petition had expired. Thus it was clearly proper to deem his claims exhausted for purposes of federal habeas review.") (internal citations omitted).

Unfortunately for petitioner, this same procedural default prevents habeas review of the merits of that claim. Habeas review of a procedurally defaulted claim is available only if the petitioner can demonstrate either "cause for the default and actual prejudice as a result of the alleged violation of federal law," or "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>accord</u> <u>Fama v. Comm'r of Corr. Servs.</u>, 235 F.3d 804, 809 (2d Cir. 2000). To make the latter showing, a petitioner must establish that he is "actually innocent." <u>Aparicio</u>, 269 F.3d at 90. In this case, petitioner has argued neither cause and prejudice nor actual innocence. Therefore, the Court cannot consider petitioner's due process challenges to the lineup and photo array. <u>See</u>, <u>e.g.</u>, <u>Daily v. New York</u>, 388 F.Supp.2d 238, 247 (S.D.N.Y. 2005);

<u>Ocasio v. Burberry</u>, No. 99-CV-361E, 2004 WL 1663990, at *4-5 (W.D.N.Y. May 21, 2004).[12]

### B. AEDPA Standards

Even if this Court were to address the merits of petitioner's due process claim, it cannot survive when properly evaluated under the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Pursuant to AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits in state court only if that adjudication (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002).

The threshold inquiry under this standard is whether the petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." <u>Kennaugh</u>, 289 F.3d at 42 (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 390 (2000)). A law is clearly established if it has been enunciated in the holding – as opposed to dicta – of a Supreme Court decision, whether as a generalized standard "or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u>, 289 F.3d at 42; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 412.

---

[12] Petitioner's claim as to the photo array is procedurally defaulted for the additional reason that he did not preserve his objection at the trial level. <u>See</u> <u>Hornedo</u>, 795 N.Y.S.2d at 85 (holding that, because defense counsel "specifically stated [at the pretrial hearing] that he was not challenging the photographic array," petitioner waived review of that issue).

A state court decision is "contrary to" Supreme Court precedent if the court "applies a rule that contradicts the governing law," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless" arrives at a different result. Williams, 529 U.S. at 406. A decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. The relevant inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable," and not merely whether, in the independent judgment of the federal habeas court, the decision was erroneous or incorrect. Id. at 409-10.

Regarding the second prong of AEDPA, a state court's factual determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1). Such determinations are unreasonable only where the petitioner rebuts the presumption of correctness "by clear and convincing evidence." Id.

## C. The Merits

As petitioner's challenge to the fairness of the pretrial identification procedures implicates clearly established federal law, and the state court adjudicated the claim on the merits, AEDPA's deferential standard of review applies. See Kennaugh, 289 F.3d at 42 (applying AEDPA standard to claim of tainted in-court identification because "Supreme Court precedent has set forth a due process standard . . . prohibiting the admission of unreliable

eyewitness testimony."). Thus, in order to obtain federal habeas relief, petitioner must

demonstrate that the Appellate Division's decision rejecting his claim "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); see, e.g., Torres v. Woods,

No. 04 CV 5560 ARR, 2005 WL 1541047, at *2 (E.D.N.Y. June 30, 2005) (applying

AEDPA standard).  Factual determinations of the state court are presumed to be correct.  28

U.S.C. § 2254(e)(1).

The "reliability of eyewitness identification testimony is usually an issue for jury

determination," and such testimony may be excluded only to preserve the accused's due

process rights when "the degree of unreliability leads to 'a very substantial likelihood of

irreparable misidentification.'"  Kennaugh, 289 F.3d at 43 (quoting Manson v. Brathwaite,

432 U.S. 98, 114, 116 (1977)).  "Where the pretrial identification procedures used with a

given witness have been impermissibly suggestive, a later in-court identification by that witness

will violate due process unless the in-court identification is shown to have reliability

independent of those procedures."  Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986).

The Supreme Court has established a two-pronged inquiry for determining whether

pretrial identification procedures have tainted an in-court identification.  First, the court must

consider "whether the pretrial identification procedures unduly and unnecessarily suggested

that the defendant was the perpetrator."  Raheem v. Kelly,  257 F.3d 122, 133 (2d Cir. 2001);

see also id. at 133-34 ("Suggestive identification procedures 'increase the likelihood of

misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's

right to due process.'") (quoting Neil v. Biggers, 409 U.S. 188, 198 (1972)).  If the

identification procedures were unfairly suggestive, the court must then "weigh the 'corrupting effect of the suggestive[ness] against other factors indicating that the identification may be independently reliable . . . .'" Raheem, 257 F.3d at 135 (quoting Manson, 432 U.S. at 114); see also Manson, 432 U.S. at 106 ("The admission of testimony concerning a suggestive . . . identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.").

### 1.  Suggestiveness

With respect to the issue of suggestiveness, "the principal question . . . is whether the appearance of the accused, matching descriptions given by the witness, so stood out from all the other[s] . . . as to suggest to an identifying witness that [that person] was more likely to be the culprit." Hinds v. Fischer, No. 03 Civ. 0907 (JSR)(FM), 2006 WL 1993249, at *9 (S.D.N.Y. June 30, 2006) (alterations in original) (quoting United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994)) (internal quotation marks omitted); see also Raheem, 257 F.3d at 134 ("A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not."). Courts have held that the dangers of misidentification are significantly increased where the suspect is the *only* member of the array or lineup matching important elements of the descriptions provided by witnesses. See Raheem, 257 F.3d at 134; United States v. James, 415 F.Supp.2d 132, 165-66 (E.D.N.Y. 2006) (noting that courts have found pretrial identification procedures to be impermissibly suggestive "where the defendant in a photo array was the only one with the skin color described by the witness."). However, "[t]here is no requirement that a suspect . . . be surrounded by people identical in appearance." Tavarez v.

LeFevre, 649 F.Supp. 526, 530 (S.D.N.Y. 1986). "[A] reasonable effort to harmonize the [lineup or photo array] is normally all that is required." Roldan v. Artuz, 78 F.Supp.2d 260, 271 (S.D.N.Y. 2000) (internal quotation marks and citation omitted).

### a. *Photo Array*

Petitioner maintains that the six-photo array was suggestive because every photo except one depicts a "considerably darker-skinned man" than petitioner. (Def. App. Br. at 58; see Pet. at 3; Pet. Reply at 11.)[13] The Court has examined the photo array and finds it to be a fair one. All of the fillers are men of color, with four appearing to be African-American and one Hispanic. Although petitioner's skin tone appears in the photo to be lighter than that of the four African-Americans, his complexion is similar to that of the Hispanic man, and therefore he cannot claim to stand out. See Roldan, 78 F.Supp.2d at 273 (although petitioner's skin color was lighter than that of three of the four fillers, he "was not the only Hispanic in the lineup, nor was he the only one with a light complexion."). Furthermore, it is obvious from examining the array that at least two of the photos, including petitioner's, are overexposed, while two are underexposed. Any apparent differences in skin tone may be attributed to these differences in photo quality. See, e.g., United States v. Adeniyi, No. 03 CR. 0086(LTS), 2003 WL 21146621, at *2 (S.D.N.Y. May 14, 2003) (noting that differences in skin tone "could as easily be the product of different photographic or image quality as of [a] true

---

[13] Petitioner does not challenge the size of the array. The Court notes, in any event, that "[s]ix is not an impermissibly small number of [individuals] for use in an identification array." United States v. Adeniyi, No. 03 CR. 0086(LTS), 2003 WL 21146621, at *2 (S.D.N.Y. May 14, 2003).

difference in skin tone, as the clarity and color quality of the images vary somewhat within the array.").

In any event, "[d]ifferential in skin color between . . . participants does not violate due process." Roldan, 78 F.Supp.2d at 273 (citing Agosto v. Kelly, No. 88 CV 1336, 1989 WL 79484, at *3 (E.D.N.Y. July 10, 1989) ("Slight variations in complexion tone, to the extent they existed, did not create an unconstitutionally suggestive pre-trial identification.")); United States v. Castellano, 610 F.Supp. 1359, 1440 (S.D.N.Y. 1985) (lineup not unduly suggestive even though defendant was the only participant with pockmarked complexion). Despite differences with respect to a particular characteristic, a photo array will not be considered unduly suggestive so long as the pictures "sufficiently resembled the defendant to allay any concern that the witnesses might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others." United States v. Padilla, No. S1 94 CR. 313 (CSH), 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994) (internal quotation marks and citation omitted); see also Adeniyi, 2003 WL 21146621, at *2 ("It is not required . . . that all of the photographs in the array be uniform with respect to a given characteristic.").

In this case, all of the individuals pictured in the photo array are similar in age and share similar facial features, closely cropped dark hair, and goatees or mustaches that minimize differences in skin tone. See United States v. Levy, No. 04-CR-559 (NGG), 2005 WL 2179650, at *2 (E.D.N.Y. Sept. 9, 2005) (concluding that six-photo array consisting of African-American men of "approximately the same age, roughly similar complexions . . . and roughly similar hairstyles" was not unfairly suggestive); Padilla, 1994 WL 681812, at *7 ("It

is apparent that [petitioner] shares a notable amount of physical characteristics with the other men.  Any slight differences in hair length or skin tone are truly insignificant and certainly do not cause [petitioner] to stand out."). In sum, "while the physical appearance of the fillers could have been closer, they were not so dissimilar as to be unduly suggestive."[14] Roldan, 78 F.Supp.2d at 275 (internal quotation marks and citation omitted); see United States v. Bubar, 567 F.2d 192, 199 (2d Cir. 1977) ("The due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility.").

### b. *Lineup*

Regarding the lineup, petitioner argues that the five fillers did not at all resemble him, who, he claims, was "the only man who looks Latino" and "the only man with a goatee." (Def. App. Br. at 58; see Pet. Reply at 11.)  Petitioner further notes that one of the fillers can be seen in the photo of the lineup holding a lit cigar, and contends that this suggested to witnesses that he was not the suspect.  (Def. App. Br. at 58; WH. 71-73.)

Petitioner's concern about the cigar ignores the trial testimony of Detective Rossi, who explained that the photograph of the lineup, while accurately depicting its composition, did not "fairly show how the lineup appeared when each individual witnesses viewed it." (T. 612.) When asked whether any witness was able to see the cigar during the lineup, Rossi answered "Absolutely not." (T. 618.).[15]

---

[14]  Indeed, defense counsel declined to challenge the photo array during the *Wade* hearing.

[15]  At the time the photo was taken, the participants were "relaxed," and the participant who was smoking a cigar as he entered the room was allowed to finish it while the lineup was being

(continued...)

Nevertheless, the lineup is somewhat troubling for another reason. Contrary to respondent's contention that petitioner and the fillers "appeared sufficiently similar" in all respects, including race and complexion (Resp. Mem. at 11), petitioner in fact appears in the photographs of the lineup to be the only man of color. While petitioner is Hispanic, all of the fillers could be Caucasian. Indeed, two of the witnesses who immediately identified petitioner at the lineup had been unable to make a positive identification when viewing the photo array that consisted of fillers with greater similarities. See *supra* pp. 6-7; see generally Foster v. California, 394 U.S. 440, 441, 443-44 (1969) (Supreme Court reversed the defendant's conviction where witness had been unable to positively identify him in first lineup, even though he was wearing a jacket similar to that worn by the robber, or in a subsequent police-arranged one-to-one confrontation between the witness and defendant, but positively identified him in a second lineup in which the defendant was the only person who had participated in the first; these procedures "made it all but inevitable" that the suspect would be identified); Raheem, 257 F.3d at 135 (the accused's protection against suggestive identification procedures encompasses "the right to avoid having suggestive methods transform a selection that was only tentative into one that is positively certain.").

The composition of the lineup in this case was not ideal. It does not follow, however, that the state courts acted unreasonably in rejecting petitioner's due process claim and in finding the lineup to be fair. While the testimony indicates that the witnesses provided

---

[15](...continued)
finalized. (T. 612, 618.) In contrast, when the eyewitnesses actually viewed the lineup, all participants "[sat] up straight" and were told to "hold the number and look straight ahead in the mirror . . . ." (T. 612.)

descriptions of petitioner to the detectives (WH. 22), the record does not reflect the nature of those descriptions, or whether the witnesses specifically noted petitioner's skin color.  See Roldan, 78 F.Supp.2d at 272-75 (despite differences in height, weight, skin tone and hair, lineup was not suggestive where the record did not contain the description the witness gave to the police, and there was consequently "no evidence that [the witness] was unduly influenced by any differences in appearance between [petitioner] and the fillers.").  Simply put, there is no evidence that the witnesses indicated that petitioner's skin color was a critical factor in their lineup selections.[16]  See, e.g., United States v. Wong, 40 F.3d 1347, 1360 (2d Cir. 1994) (lineup not suggestive despite difference in height between defendant and the other lineup participants where the witness identified defendant "because of his facial features").

Consequently, in contrast to cases in which courts have found pretrial identification procedures to be problematic, it cannot be said here that the witnesses "emphasized a particular characteristic of the perpetrator in giving a description to the police" and that the accused was the only lineup participant to have that characteristic.  See Raheem, 257 F.3d at 134, 137 (lineup unduly suggestive where "the most prominent feature . . . mentioned by [witnesses] in their descriptions to the police was the shooter's black leather coat," and petitioner was the only one wearing such a coat during the lineup); see also United States v. Eltayib, 88 F.3d 157, 166 (2d Cir.1996) (photo array unduly suggestive where witness had described perpetrator as having "a head full of hair, real bushy hair, afro-type hair," defendant's photo

---

[16]  The witnesses did testify at trial as to their recollections of petitioner's appearance, noting that he was approximately six feet two inches tall with a good build, light skin and short hair.  (See T. 180, 241-42, 291-92, 339, 383.)  To the extent that "light skin" was a characteristic in the witnesses' minds, petitioner does not complain that he stood out from the fillers in the lineup because of his light-colored skin; to the contrary, he argues that he was *darker* than the fillers.

was the only one showing a full head of hair, and the other photos pictured subjects with darker skin than defendant); Holmes v. Artus, No. 03Civ.7065(LAP) (GWG), 2005 WL 1027195, at *12-14, 17 (S.D.N.Y. May 4, 2005) (lineup unduly suggestive where many witnesses had described petitioner as having light complexion and stocky build, and petitioner was the only one fitting this description in lineup); United States v. Perez, 248 F.Supp.2d 111, 113-14 (D. Conn. 2003) (photo array was suggestive where witness repeatedly referred to petitioner's "dark complexion," all other photos were of men with "markedly lighter faces," and witness had indicated that skin color was a "distinguishing referent" in his examination of another photo array).

The suggestiveness of a pretrial identification procedure is a mixed question of law and fact. See Alvarez v. Keane, 92 F.Supp.2d 137, 152 (E.D.N.Y. 2000); Leka v. Portuondo, 76 F.Supp.2d 258, 268 (E.D.N.Y. 1999), rev'd on other grounds, 257 F.3d 89 (2d Cir. 2001). The factual findings of the hearing court and Appellate Division are entitled to a presumption of correctness, and the courts' legal determination that the lineup was not suggestive was neither contrary to, nor involved an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d), (e)(1). Those rulings should not be disturbed on habeas review.

### 2. Independent Reliability

In any event, even assuming that the pretrial identification procedures were suggestive, the identifications of petitioner were independently reliable and thus their admission into evidence at trial did not violate petitioner's right to due process. See United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994) (exclusion of identification evidence is warranted "only if it

was *both* produced through an unnecessarily suggestive procedure *and* unreliable"); Torres, 2005 WL 1541047, at *4 ("The court need not determine . . . whether petitioner met the description of the perpetrator while the other lineup participants did not or the police officers made a reasonable effort to find fillers matching the perpetrator's general description, because the identifications were independently reliable under the totality of the circumstances . . . .").

Because the state courts ruled only on the suggestiveness of the lineup, this Court must consider *de novo* whether the identifications were independently reliable. See Torres, 2005 WL 1541047, at *4 (citing Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003)). The question of independent reliability must be assessed in light of the totality of the circumstances, including the following factors: (1) the witnesses' opportunity to view the accused at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' prior description of the perpetrator; (4) the level of certainty demonstrated by the witnesses at the time of the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200; see also Manson, 432 U.S. at 114.

With one exception, all of the witnesses who viewed the lineup had an opportunity to closely observe petitioner both at 12:30 a.m. on September 28th when he threatened the group of youths next door and again at 11:30 p.m. that night when he returned.[17] Danny and Edda Abraham, DeJesus and Gargiulo stood just a few feet away from petitioner and spoke to him before he attacked Danny Abraham. Gagliardo, looking down from his second-story window, and Tropia, watching from approximately 50 feet away, testified that nothing was blocking their view of petitioner. (T. 243, 266, 413-14, 421.) Although it was nighttime, there was

---

[17] Edda Abraham was present only during the second incident.

ample artificial lighting.  (T. 181, 189, 240, 243, 252-53, 292, 304,  338, 343, 380.)  Each

witness was an attentive observer, with four explaining that they were looking directly at

petitioner during the altercation and two testifying that they had specifically interrupted their

evening activities to see what was transpiring.  The lineup was conducted less than twenty-four

hours after the crimes occurred, with the incidents still fresh in the witnesses' minds.  Each

witness, when viewing the lineup, identified petitioner quickly and without equivocation.[18]

Three of the witnesses had identified petitioner the day before from a photo array that was so

plainly fair that even petitioner's trial counsel declined to challenge it.

Significantly, defense counsel had the opportunity to challenge the credibility and

reliability of the witnesses' in-court identifications by cross-examining them about the lineup,

but he chose not to do so.  The trial court instructed the jury to carefully examine all evidence

on the issue of identity, paying particular attention to the "circumstances surrounding the

witnesses' identification of the accused," such as lighting conditions, their proximity to and

ability to observe the perpetrator, and their recollections of his physical characteristics.  (T.

725-28.)  The court cautioned the jurors that they should not convict unless convinced beyond

a reasonable doubt that the accused was the one who committed the crime.  (T. 725.)

Accordingly, even assuming that the state courts acted unreasonably in ruling that the

lineup was not suggestive, the admission of the identification evidence did not violate

petitioner's right to due process because its independent reliability eliminated any substantial

---

[18]  The witnesses, who were separated from each other, were each asked, "Do you recognize
anyone?," and immediately responded "Yes," and identified petitioner.  Each was asked how he
or she knew the person selected, and answered that he was the man who had attacked Abraham
and Lopez.  (See WH. 44-51.)

likelihood of irreparable misidentification. See Dow v. Walsh, No. 03-CV-424(LB), 2006 WL 484783, at *7 (E.D.N.Y. Feb. 28, 2006) (in-court identification was independently reliable where three victim witnesses had adequate opportunity to view petitioner, defense attorney vigorously challenged the reliability of their identifications, and court instructed jurors to scrutinize identification testimony); Alvarez v. Conway, No. 05 Civ. 3235 (N.B.), 2005 WL 3434634, at *7 (S.D.N.Y. Dec. 13, 2005) (even assuming that the state court erred in finding lineup was not suggestive, identification was independently reliable where witness had seen petitioner twice before and had identified two different photographs of him); Harvey v. Duncan, No. 02CIV4208 KMWKNF, 2005 WL 2333629, at *4 (S.D.N.Y. Sept. 21, 2005) (in-court identification was independently reliable where witness had a clear opportunity to observe petitioner, was an attentive observer of the crime, and "expressed certainty" in her identification, which occurred just a few hours after the crime); Torres, 2005 WL 1541047, at *5 (identifications independently reliable where both witnesses had ample opportunity to view petitioner in broad daylight as he talked to them before the robbery, one witness knew petitioner previously, and both readily identified him from the lineup); Valentine v. Skinner, No. 04 Civ. 1416 LAP JCF, 2005 WL 165285, at *3 (S.D.N.Y. Jan. 25, 2005) (although state court erred in finding lineup was not suggestive, identifications were independently reliable where both witnesses had opportunity to view petitioner during fight, readily identified him in lineup, and had previously identified him from a photo array twelve hours after the crime occurred).

### 3. Harmless-Error Analysis

In any event, any error in admitting the identification evidence was harmless and would not warrant disturbing petitioner's conviction.

"In making a determination of harmless error, the court looks to the record as a whole, considering the overall strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." Holmes, 2005 WL 1027195, at *19 (quoting Brown v. Keane, 355 F.3d 82, 92 (2d Cir. 2004)); see also Raheem, 257 F.3d at 140-41 (corroborative evidence of guilt is an appropriate factor to consider in a harmless-error analysis).

The prosecution presented ample circumstantial evidence connecting petitioner to the crime. Six witnesses testified that in the early morning on the day of crime, they saw a man get into a fight and threaten to come back and "cap" someone. That night, the man returned, asked Abraham and his friends if they were associated with the group from earlier that morning, and attacked Abraham and Lopez. The perpetrator identified himself as King Pee Wee, a street name that the police were able to connect to petitioner. The witnesses noted that the perpetrator was driving a red Ford Probe, the same car that the police found parked in front of petitioner's mother's house and determined to be registered to his girlfriend. The weapon witnesses described the perpetrator as having used – a Club – was found inside the car.

Given the strength of the prosecution's case against petitioner, the in-court identifications and lineup evidence were not crucial to the jury's verdict. In fact, faced with overwhelming evidence placing petitioner at the scene, defense counsel did not make

misidentification the cornerstone of petitioner's defense.[19]  Instead, he sought to establish that, while witnesses may have seen petitioner hit Lopez with the Club, no one saw him with a knife and no one saw him stab Lopez.  According to defense counsel, it was the stab wounds, not the blow to the head, that caused Lopez's death.  (T. 670-79.)

"Because the trial court's decision to admit the identification testimony could not have played a role in the jury's decision to convict [petitioner], any error resulting from the admission of the identification testimony at trial was 'harmless beyond a reasonable doubt.'" Holmes, 2005 WL 1027195, at *26 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)); see also Darco v. United States, No. 04-CV-1378 (CPS), 2005 WL 1804475, at *8 (E.D.N.Y. July 28, 2005) (even if it was error to admit witness identifications, error was harmless because the evidence was merely cumulative; two other witnesses had also identified petitioner as the bank robber, and the prosecution "introduced a gun, a license plate seen on the getaway car, and money straps from the [the victim bank] that were all found in the car that [petitioner] was seen driving shortly before his arrest"); Robinson v. Mazzuca, No. 01 CIV. 0001(LTS)(JCF), 2002 WL 31246535, at *6 (S.D.N.Y. Oct. 7, 2002)  (even if identification was unreliable, its admission was harmless error in light of other evidence connecting petitioner to the crime).[20]  Therefore, petitioner's due process eyewitness identification claim

_____

[19] Defense counsel did attempt, on cross-examination, to highlight discrepancies in the witnesses' testimony regarding how many people they saw in the red and black cars and what the perpetrator was wearing; he did not, however, emphasize this evidence on summation.

[20] The Supreme Court has articulated several different tests for determining whether an error may be considered harmless.  On direct review of a criminal conviction, the error may be overlooked if it is "harmless beyond a reasonable doubt."  Chapman, 386 U.S. at 24.  Prior to the enactment of AEDPA, the Supreme Court held that a "less onerous" harmless-error

(continued...)

should be denied.

## III. Claim of Prosecutorial Misconduct

### A. Factual Background

Petitioner additionally claims that the prosecutor, in his opening statement and

summation, deprived him of a fair trial by (1) improperly shifting the burden of proof to the

defense; (2) denigrating the defense; (3) appealing to community prejudice with inflammatory

characterizations of the crime; (4) mischaracterizing the evidence; and (5) arguing from facts

not in evidence.  (Pet. at 3.)  Specifically, petitioner complains of the following comments:

The prosecutor began his opening statement by telling the jury that "[a] violent

depraved gang led by one characterized by sheer terror and fury chased a defenseless 17-year-

old boy into a chasm of death." (T. 20-21.)  Later, the prosecutor referred to petitioner and his

associates as "a group of thugs" (T. 28), and to the murder victim's dog as "man's best

friend."  (T. 27.)

On summation, after proffering his summary of the evidence, the prosecutor told the

---

[20](...continued)
standard applies on habeas review:  i.e., whether the error had a "substantial and injurious
effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619,
637 (1993) (internal quotation marks and citation omitted).  After the enactment of AEDPA,
the Second Circuit held that, where the state court had itself engaged in a harmless-error
analysis, the applicable test on habeas review is whether the state court unreasonably applied
Chapman.  See Gutierrez v. McGinnis, 389 F.3d 300, 306 (2d Cir. 2004) (citing Mitchell v.
Esparza, 540 U.S. 12, 18 (2003) (per curiam)).  Where, however, as in the present case, the
state court has not conducted its own harmless-error review, it remains an open question
whether the federal habeas court should apply the Chapman or Brecht standard.  See Benn v.
Greiner, 402 F.3d 100, 105 (2d Cir. 2005); Bratcher v. McCray, 419 F.Supp.2d 352, 362 n.6
(W.D.N.Y. 2006); Holmes, 2005 WL 1027195, at *18.  In this case, the Court need not
resolve this issue, as the result would be the same under either standard.  See Bratcher, 419
F.Supp.2d at 362-63; Holmes, 2005 WL 1027195, at *19.

jury that the defense theory "ridiculously demonstrated such a disdain for the truth and disregard . . . [for] the life of Elliott Lopez." (T. 690.) The prosecutor later attempted to reconcile the testimony of witnesses that petitioner was driving a 1991 Ford Probe with that of the crime scene detective that it was a 1989 model year by explaining that the detective had made an "an error in his paperwork . . . ." (T. 701.) He added that the overwhelming evidence that petitioner was driving the car that witnesses saw made this case "Brooklyn's version of [the film] 'My Cousin, Vinny.'" (T. 701.) Next, the prosecutor characterized petitioner's behavior before his arrest, when he was ducking in and out of the window in his mother's second-floor apartment, as being consistent with "trying to avoid responsibility for his own actions" and "trying to avoid being detected by the police." (T. 711.)[21] Finally, the

---

[21] The context of the comment was as follows:

> [Prosecutor]: You also heard testimony from Detective Rossi about the defendant after he received that phone call, about what he did after that. The defendant was on the third story out that window. Half of his body c[a]me out of that window. There's no ladder there. There's no fire escape, no tree. What does that tell you? The defendant was trying to avoid responsibility for his own actions - -

> [Defense Counsel]: Objection, your Honor.

> The Court: Sustained.

> [Prosecutor]: - - trying to avoid being detected by the police.

> [Defense Counsel]: Objection, your Honor.

> The Court: Sustained. Let's forget about the window, okay.

(continued...)

prosecutor recounted petitioner's post-arrest statement to the police and contrasted it with the

testimony of six eyewitnesses, urging the jury to consider "why isn't the defendant telling the

truth?" (T. 712.)[22]

---

. . . .

> [Prosecutor]: Use your common sense, ask yourselves
> why is he coming out of that window? Why is he not
> coming out telling you the truth?
>
> [Defense Counsel]: Objection, your Honor.
>
> The Court:   Sustained. Let's go on.

(T. 711, 713.)

[22] The context of the comment was as follows:

> [Prosecutor]: We also heard about the defendant's statement and he
> gave a statement to Detective Hernandez after he was arrested. . . .
> What does the defendant tell you? He tells you that he got into that
> fight on 77th Street, his girlfriend was robbed. He had a motive
> himself. He independently verifies what those witnesses say who saw
> him that night. He says he got there in that red Ford Probe . . . . The
> defendant admitted his nickname was Pea Wee [sic]. . . . He admitted
> what he thought he could. Then he denied what he thought he had to,
> saying he was at his mother's house; didn't go out that night except to
> get something to eat. You know what? Everyone here in the
> courtroom knows that is just not accurate. Six different identifying
> witnesses tell you in clear and in no uncertain terms that is absolutely
> not accurate. Why isn't the defendant telling the truth? He's
> attempting to avoid again - -
>
> [Defense Counsel]: Objection, your Honor.
>
> The Court: Sustained. Take that out. Strike that out.

(T. 711-13.)

**B. Legal Analysis**

The scope of habeas review for allegations of prosecutorial misconduct is "quite limited." Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998). A writ of habeas corpus will not issue on the basis of a prosecutor's improper remarks unless the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also United States v. Young, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone . . . ."); United States v. Newton, 369 F.3d 659, 680 (2d Cir. 2004) (noting the heavy burden imposed on a habeas petitioner asserting prosecutorial misconduct).

In order for prosecutorial misconduct to rise to the level of constitutional error, the prosecutor's comments must constitute "more than mere trial error." Tankleff, 135 F.3d at 252. "[I]t is not enough that the prosecutor['s] remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (internal quotation marks and citation omitted). The petitioner must additionally establish "that he suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." Tankleff, 135 F.3d at 252 (quoting Bentley v. Scully, 41 F.3d 818, 823 (2d Cir. 1994)) (internal quotation marks omitted); accord United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) ("Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'") (quoting Donnelly, 416 U.S. at 647); Kae v. Artuz, No. 98-CV-4711 FB, 2000 WL 1738339, at *4 (E.D.N.Y. Nov. 21, 2000); Bossett v. Portunado, No. 97 CV 2116, 1998 WL 433860, at *3 (E.D.N.Y. July 28, 1998) ("No matter how blameworthy the conduct of the prosecutor, a collateral attack on

constitutional grounds is warranted only when the court has reason to believe that the prosecutorial misconduct influenced the jury's verdict.").

Three factors that courts consider in determining whether prejudice occurred are: (1) the severity of the misconduct, such as whether the comments manipulated or misstated evidence, and whether they implicated other specific rights of the accused; (2) the nature of curative measures, if any, taken to remedy the prejudice, such as admonitions or instructions to the jury; and (3) the certainty of the conviction absent the improper conduct. See Bentley, 41 F.3d at 824; Darden, 477 U.S. at 182. It is a "rare case[]" in which even improper summation comments will be deemed "so numerous and, in combination, so prejudicial that a new trial is required." Floyd v. Meachum, 907 F.2d 347, 348 (2d Cir. 1990).

Importantly, any alleged prosecutorial misconduct cannot be examined in a vacuum. Rather, the comments must be reviewed in the context of the defense counsel's summation that preceded it. Improper argument by the prosecution during closing statement is less likely to be found actually prejudicial to the fairness of the trial where the defense summation invited the prosecution's response. See Darden, 477 U.S. at 179 ("It is helpful as an initial matter to place [the prosecution's] remarks in context. . . . The prosecutor's comments must be evaluated in light of the defense argument that preceded it . . . ."); Escobar v. Senkowski, 02Civ.8066LAKTHK, 2005 WL 1307939, at *14 (S.D.N.Y. May 26, 2005) (noting "that where the defense's summation invites a particular response from the prosecution, such a response is less likely to jeopardize the trial's fairness.").

In this case, the Second Department rejected petitioner's claims of prosecutorial misconduct, concluding that he "was not unduly prejudiced by the prosecutor's questionable

remarks, given the trial court's prompt curative instructions." Hornedo, 759 N.Y.S.2d at 85

(citation omitted). Because the right of an accused to a fair trial is clearly established federal

law, and the state court adjudicated petitioner's claim on the merits, AEDPA's deferential

standard applies to petitioner's challenge to the prosecutor's comments. Accordingly,

petitioner can prevail only if he demonstrates that the state court's "adjudication of his claim

alleging prosecutorial misconduct is either contrary to, or involved an unreasonable application

of, the above-referenced Supreme Court precedent." Tolliver v. Greiner, No. Civ.

02CV0570LEKRFT, 2005 WL 2179298, at *11 (N.D.N.Y. Sept. 8, 2005).

Petitioner cannot make this showing. The majority of the challenged remarks, while at

times overwrought or designed to provoke the jury's sympathy, may properly be considered

"rhetorical comments that are not so inflammatory as to affect the fundamental fairness" of the

trial. Jones v. Keane, 250 F.Supp.2d 217, 237 (W.D.N.Y. 2002). "[A] prosecutor is not

precluded from vigorous advocacy, or the use of colorful adjectives, in summation." United

States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995) (finding that the prosecutor's

characterization of the defense case as a "fairy tale" was not improper); see United States v.

Simmons, 923 F.2d 934, 955 (2d Cir. 1991) (comments concerning "collapsed veins of

junkies" and "swollen arms" were "blunt and to the point" but did not warrant new trial);

Brinson v. Walker  407 F.Supp.2d 456, 473 (W.D.N.Y. 2006) (where prosecutor "questioned

whether petitioner had been wearing 'those nice fancy suits that he's been wearing' at trial

when he committed crimes in the past and made several other sarcastic remarks about

petitioner's apparel," habeas court concluded that the comments "were ill-advised but not so

prejudicial that they denied petitioner a fair trial."); Copeland v. Walker, 258 F.Supp.2d 105,

132-33 (E.D.N.Y. 2003) (where prosecutor told jury, in a trial for murder of a police officer, that the victim "was the recipient of a symbolic message by the agents of death," habeas court concluded that the comment, "while perhaps more colorful than necessary, was a fair statement of the record."); Jones, 250 F.Supp.2d at 237 (references to petitioner during summation as a "liar," "con artist" and "flimflam man" were "rhetorical comments in line with the theory of the prosecution."); Harper v. Kelly, 704 F.Supp. 375, 379 (S.D.N.Y. 1989), rev'd on other grounds, 916 F.2d 54 (2d Cir. 1990) (statements made by prosecutors in their summations, even if seemingly improper, do not necessarily exceed "the broad range of rhetorical comments allowed in closing arguments."). Indeed, the comments at petitioner's trial are far less objectionable than those that the Supreme Court has held not to be constitutionally defective. See Darden, 477 U.S. at 180 & nn.10-12 (prosecutor remarked that the death sentence was "the only way that I know that [the petitioner] is not going to get out [and assault] the public," that the petitioner "shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash," and that he wished that "someone had walked in the back door and blown [the petitioner's] head off . . . .").

To the extent that any of the allegedly inflammatory comments were improper, the state court did not act unreasonably in concluding that the remarks were not so egregious, either individually or cumulatively, as to deprive petitioner of a fair trial. See Escobar, 2005 WL 1307939, at *15 ("[A] prosecutor's improper comments during summation must be more than 'short and fleeting,' but must instead be 'so numerous and, in combination, so prejudicial that a new trial is required.'") (quoting Tankleff, 135 F.3d at 253); Miller v. Barkley, No. 03 Civ. 8580(DLC), 2006 WL 298214, at *3 (S.D.N.Y. Feb. 8, 2006) ("The prosecutor's statements

were brief and not a significant part of the State's argument or summation.").

Moreover, as the Second Department held, any potential for prejudice was mitigated by the trial court's prompt curative actions. The judge sustained defense counsel's objections to each remark, specifically struck certain ones from the record, and in several instances admonished the prosecutor. (T. 20-21, 27, 28, 690, 705, 711, 712-13.) In his final charge to the jury, the judge instructed the jurors to disregard any statements stricken from the record, and told them that they were "not obligated to accept any of the arguments made by the attorneys in their summations." (T. 715-16.) "Improper commentary by the prosecution does not warrant habeas relief if the trial court sustains objections, strikes offending comments, and issues appropriate curative instructions in response." Brown v. Schultz, No. 03 Civ. 3320 PAC/HBP, 2006 WL 156983, at *11 (S.D.N.Y. Jan. 18, 2006) (internal quotation marks and citation omitted); see Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (although prosecutor's comments regarding shooting victim's "virtuous nature" and the community's "cry for safer streets" were inappropriate, they did not render the trial unfair, given the court's curative actions and strong evidence of guilt); United States v. Torres, 845 F.2d 1165, 1172 (2d Cir. 1988) (potential prejudice from prosecutor's opening statement concerning enforcement of the drug law was dissipated by court's instruction to "[j]ust tell us what you're going to prove."); Escobar, 2005 WL 1307939, at *16 (trial court appropriately cured any prejudice stemming from prosecutor's statements of opinion about witnesses' credibility by sustaining objections and striking such portions from the record); Williams v. Donnelly, No. 00-CV-4445DGT, 2005 WL 2290592, at *12-13 (E.D.N.Y. Apr. 12, 2005) (prosecutor's comments describing victim as a "hard working man, who was trying to live the American

dream" did not manipulate or misstate evidence, were mitigated by jury instructions to deliberate "without any kind of fear, favor, passion, prejudice, sympathy of any kind," and were not unfairly prejudicial).

Particularly in a case such as this, where the prosecutor's comments were relatively innocuous, the Court must presume that the jury heeded the trial judge's instructions regarding what they should and should not consider. See generally Greer v. Miller, 483 U.S. 756, 766 n.8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions.") (internal quotation marks and citation omitted); accord Brown, 2006 WL 156983, at *11 ("There is no reason to believe that the jury in this case did not disregard the stricken testimony and commentary as contemporaneously instructed by the trial judge.").

Similarly, with respect to the prosecutor's effort to resolve inconsistencies in the testimony by suggesting that the detective had made an "error in his paperwork" regarding the year of the red Ford Probe automobile (T. 701), the judge instructed the jurors that they must "engage in careful reasoning and [] be satisfied beyond a reasonable doubt that the inferences [they] reach from circumstantial facts flow naturally, reasonably and logically from the facts proved and are consistent with all such facts." (T. 732.) In any event, there was no impropriety in the prosecutor's comment, as it was responsive to defense counsel's summation, which called attention to the discrepancy. (T. 669.)[23] See, e.g., Brown, 2006 WL 156983, at

---

[23] As defense counsel noted, Joseph Gagliardo testified that, as a former employee of Ford Motor Company, he was certain that the car driven by petitioner was a 1991 model, while one of
(continued...)

*12 (defense summation specifically raised the issue of no prerecorded buy money being found on petitioner, inviting the prosecution to proffer some explanation in response during its summation).

A prosecutor ordinarily "has broad latitude in the inferences it may reasonably suggest to the jury during summation." United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotation marks and citation omitted); see United States v. Roldan-Zapata, 916 F.2d 795, 807 (2d Cir. 1990) ("In summation counsel are free to make arguments which may be reasonably inferred from the evidence presented.") (citations omitted). The prosecutor's comments in this regard were well within the bounds of the law. See United States v. Gerry, 515 F.2d 130, 144 (2d Cir. 1975) (rejecting defense challenge to prosecutor's "speculation" that hostile witness called by the government "was being supported by" defendant during the period of the witness' disappearance; the "comments did not transgress the broad limits within which counsel for both sides are entitled to argue the inferences which they wish the jury to draw from the evidence.") (internal citation and quotation marks omitted); Moore v. Greiner, 02 Civ.6122(SAS)(DF), 2005 WL 2665667, at *15 (S.D.N.Y. Oct. 19, 2005) ("A prosecutor is properly given wide latitude in summation, and is entitled to comment upon evidence presented at trial and to urge the jury to draw reasonable inferences from that evidence.") (internal citations omitted); Alvarez v. Conway, No. 05 Civ. 3235(N.B.), 2005 WL 3434634, at *9 (S.D.N.Y. Dec. 13, 2005) (holding that prosecutor's conclusions could be reasonably inferred from the evidence, and were "clearly invited" by statements in defense counsel's own

[23](...continued)
the crime scene detectives had indicated that, according to his notes, a witness had described the red Ford Probe as a 1989 model. (Tr. 669; see T. 413, 513; see also T. 451.)

41

summation).

Petitioner also contends that the prosecutor's comment that the defense was attempting to "avoid responsibility," and his urging the jury to consider "[w]hy is he not coming out and telling you the truth?" and "[w]hy isn't the defendant telling the truth?" (Pet. Reply at 17), impermissibly shifted the burden of proof to the accused.  See United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990) (prosecutor may not suggest that the accused has any burden of proof or any obligation to adduce any evidence).  However, when properly considered in context, the remarks clearly did not have that effect.  The comment regarding petitioner's attempt to avoid responsibility was specifically directed to his evasive behavior prior to his arrest when, the testimony established, he was seen leaning his body out of a window after receiving a phone call warning him that the police were on their way.  The prosecutor's remark cannot be understood to imply that petitioner had a burden at trial to tell the jury his version of events.  While it is possible, in the abstract, to construe the question, "[w]hy is he not coming out telling you the truth?," as referring to petitioner's failure to testify, the context in which it was made shows that it was instead a reference to his apparent attempt to escape through a window rather than surrender to police.  (Cf. PH. 20; 9/25/00 Op. at 3.)

The prosecutor's other comment regarding petitioner's failure to tell the truth was similarly innocuous, as it related to statements petitioner made to police when in custody, not to his failure to testify at trial.  The prosecutor was urging the jury to compare his assertions of innocence to the police with the testimony of six witnesses at trial, and to find the latter more credible.  See Trueluck v. Phillips, No. 03 Civ. 0904(JCF), 2003 WL 22390113, at *4 (S.D.N.Y. Oct. 20, 2003) (where prosecutor suggested that the accused's statement to law

enforcement lacked credibility, the habeas court concluded that the prosecutor merely "focused the jury on the evidence and suggested that [a key witness'] testimony was the more credible; he did not diminish the prosecution's burden of proof."); Concepcion v. United States, 181 F.Supp.2d 206, 222 (E.D.N.Y. 2002) (holding that "the prosecutor had a right to accuse [petitioner] of lying to the police when questioned about the shootout," and "based on the eyewitness testimony, the prosecutor had a right to accuse [petitioner] of having shot [one of the victims].").

Even if the prosecutor's comments could be construed as shifting the burden of proof, any possible misconception by the jury was cured both by the trial court's striking the comments and by its final charge to the jury, which explained at length the presumption of innocence and the prosecution's burden of proof.[24] The court's instructions to the jury were sufficient to counteract any conceivable misunderstanding regarding the burden of proof resulting from the prosecutor's brief comments that petitioner was not being truthful. See United States v. Mapp, 170 F.3d 328, 337-38 (2d Cir. 1999) (prosecutor's summation that

---

[24]The court instructed:

> [I]n this case Mr. Hornedo decided not to testify. . . . [T]he law places the burden of proving guilt beyond a reasonable doubt upon the district attorney and that burden never shifts to the accused's table. So, therefore, since Mr. Hornedo has chosen not to testify, that's proof - - not proof of anything, okay. And you can't draw any conclusion. You can't be thinking, "Well, I would have liked to hear his side of the story." There's only one side, [the prosecutor's] side, his obligation to prove guilt beyond a reasonable doubt. So you can't speculate.

(T. 720.) Later, the judge reiterated this principle: "The accused is not required to prove he's not guilty. In fact, the accused is not required to prove anything." (T. 722-23.)

arguably "impermissibly suggest[ed] that [defendant] has an obligation to testify or that he has any burden of proof" was not reversible error because any prejudice was eliminated by court's instructions); United States v. Cruz, 797 F.2d 90, 93 n.1 (2d Cir. 1986) (finding that defendant was not denied a fair trial despite prosecutor's comments that "[t]he defense . . . has to convince you," because the trial court instructed the jury that the "burden at all times remained on the government to prove its case beyond a reasonable doubt"); Lebron v. Girdich, No. 03 Civ. 2765(N.B.), 2003 WL 22888809, at *3 (S.D.N.Y. Dec. 5, 2003) (any prejudice resulting from prosecutor's statement relating to burden of proof and petitioner's decision not to take the stand was cured by the court's general jury instructions before deliberations).

Finally, in light of the overwhelming evidence of guilt presented at trial, petitioner cannot establish that the prosecutor's comments, singly or in combination, had a substantial influence on the jury's verdict. The Second Circuit has explained that "[o]ften, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal." United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981). In this case, six eyewitnesses, including one of the alleged victims, testified that they saw petitioner assault Abraham and Lopez, and then chase Lopez around a corner, where he was later found murdered. Another witness saw petitioner's car pull up behind Lopez and saw the driver and several other youths begin beating him. This is not a case in which "the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury." Tankleff, 135 F.3d at 253.

Given the compelling evidence of guilt, and the trial court's "prompt curative instructions," the Second Department understandably concluded that petitioner "was not unduly prejudiced by the prosecutor's questionable remarks . . . ." Hornedo, 759 N.Y.S.2d at 85. Petitioner thus cannot establish that the jury's verdict would have been different absent the prosecutor's challenged comments. See Bentley, 41 F.3d at 825 (petitioner failed to demonstrate injurious impact on jury where the evidence against him was "compelling" and "the prosecutor's summation comments were both brief and isolated"); Bradley v. Meachum, 918 F.2d 338, 343 (2d Cir. 1990) ("The clear evidence of guilt demonstrates that [petitioner] was not prejudiced by the prosecutor's improper remarks."); Brown, 2006 WL 156983, at *12 ("In light of the strong evidence of guilt presented at trial, coupled with the fact that the prosecutor's comments were 'extremely brief and limited,' . . . petitioner has failed to establish that the prosecutor's conduct had a substantial or injurious effect or influence on the jury's verdict.") (internal citation omitted); Boddie v. Edwards, No. 97 Civ.7821 MGC, 2005 WL 914381, at *8 (S.D.N.Y. Apr. 20, 2005) ("Given the evidence of [petitioner's] guilt adduced at trial and the careful and thorough admonition in the court's charge that the jurors were to rely on their own assessment of the evidence, it cannot be said that [the prosecutor's] comments, even if improper, deprived [petitioner] of a fair trial.").

Accordingly, the Second Department did not act unreasonably in rejecting petitioner's challenge to the prosecutor's opening statement and summation. Petitioner's claim should therefore be denied.

## CONCLUSION

For the reasons set forth above, it is the recommendation of this Court that Hornedo's application for a writ of habeas corpus be denied and the petition dismissed.

Any objections to the recommendations contained herein must be filed with the Honorable Nicholas G. Garaufis on or before February 13, 2007. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

The clerk is directed to docket this Report and Recommendation through the Electronic Case Filing System and to mail a copy to petitioner at the following address:

> Manuel Hornedo # 00A6357
> Clinton Correctional Facility (Annex)
> P.O. Box 2202
> Dannemora, N.Y.  12929

**SO ORDERED.**

**Dated:  Brooklyn, New York**
**January 26, 2007**

**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**